# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 16-740

**STATE OF LOUISIANA**
**IN THE INTEREST OF S.C., M.C., K.C., AND A.C.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 15-18146
HONORABLE CURTIS SIGUR, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## PHYLLIS M. KEATY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Phyllis M. Keaty, and John E. Conery, Judges.

**AFFIRMED.**

**S. Marie Johnson**
**Public Defender's Office**
**106 West Berard Street**
**St. Martinville, Louisiana 70582**
**(337) 394-1446**
**Counsel for Appellant:**
    **N.D. (mother)**

**Shentell Brown**
**Attorney at Law**
**110 West Washington Street**
**New Iberia, Louisiana 70560**
**(337) 365-4006**
**Counsel for Appellee:**
**B.C. (father)**

**M. Bofill Duhé**
**District Attorney**
**W. Claire Howington**
**Assistant District Attorney**
**Sixteenth Judicial District**
**300 Iberia Street, Suite 200**
**New Iberia, Louisiana  70560**
**(337) 369-4420**
**Counsel for Appellee:**
**State of Louisiana**

**Robert "Bobby" Odinet**
**Assistant District Attorney**
**415 South Main Street**
**St. Martinville, Louisiana  70582**
**(337) 394-2220**
**Counsel for Appellee:**
**State of Louisiana**

**Charlotte Bordenave**
**Barry L. LaCour**
**Mental Health Advocacy Service**
**Child Advocacy Program**
**302 Dulles Drive, Suite U-47**
**Lafayette, Louisiana  70506**
**(337) 262-2030**
**Counsel for Appellees:**
**S.C. (child)**
**M.C. (child)**
**K.C. (child)**
**A.C. (child)**

**KEATY, Judge.**

The mother, N.D.,[1] appeals the trial court's judgment ordering S.C., M.C., K.C., and A.C to remain in foster care. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

N.D. is the biological mother and B.C. is the biological father of four children: S.C., born on January 6, 2011; M.C., born on May 27, 2012; K.C., born on May 28, 2013; and A.C., born on March 8, 2015. On October 26, 2015, the State of Louisiana, Department of Children and Family Services (DCFS) received a report that N.D. and B.C. were not adequately supervising the children. The children were placed in the temporary custody of the DCFS pursuant to an Oral Instanter Order on October 27, 2015, and a confirmed written Instanter Order dated October 28, 2015. At the time of their removal from their parents' custody, the children were the following ages: four years old; three years old; two years old; and seven and one-half months, respectively. Following an adjudication hearing on March 8, 2016 and April 6, 2016, the trial court determined they were children in need of care. A disposition hearing was held on April 25, 2016, and the parties stipulated to the continued custody of the children with the State. Following the hearing, the trial court signed the disposition judgment.

On May 11, 2016, N.D. filed the instant appeal from the April 25, 2016 judgment. On appeal and in her sole assignment of error, N.D. contends the trial court erred in granting judgment in favor of the State, adjudicating S.C., M.C., K.C., and A.C. as children in need of care. B.C. has not appealed.

---

[1] Initials are used to protect the confidentiality of the parties pursuant to La.Ch.Code art. 412.

## STANDARD OF REVIEW

"We review the juvenile court's findings of fact under the manifest error standard of review[.]" *State ex rel. J.Y.M.*, 09-1335, p. 5 (La.App. 3 Cir. 8/4/10), 45 So.3d 1128, 1132. In *State ex rel. D.H.*, 04-2105, pp. 7-8 (La.App. 1 Cir. 2/11/05), 906 So.2d 554, 560, the first circuit noted:

> [I]t is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. [*In re A.J.F.*, 00-948 (La. 6/30/00), 764 So.2d 47.] Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. *Id.*; *see Rosell v. ESCO*, 549 So.2d 840 (La.1989). If the juvenile court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.*; *see Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 2001-2217 (La. 4/3/02), 816 So.2d 270.
>
> In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and if such a basis does exist, (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *See Stobart v. State, through DOTD*, 617 So.2d 880 (La.1993). If there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Id.*

## DISCUSSION

In her sole assignment of error, N.D. contends the trial court erred in granting judgment in favor of the State, adjudicating the minor children in need of care. Louisiana Children's Code Article 606 sets forth the grounds on which a child can be found in need of care providing, in pertinent part:

> A. Allegations that a child is in need of care must assert one or more of the following grounds:
>
> (1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an

interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.

(2) The child is a victim of neglect.

. . . .

B. A child whose parent is unable to provide basic support, supervision, treatment, or services due to inadequate financial resources shall not, for that reason alone, be determined to be a child in need of care.

Abuse and neglect are defined in La.Ch.Code art. 603. "Abuse" is "any one of the following acts which seriously endanger the physical, mental, or emotional health and safety of the child[.]" La.Ch.Code art. 603(2). Those acts include "[t]he infliction, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person." La.Ch.Code art. 603(2)(a). "Neglect" is defined in La.Ch.Code art. 603(16) as:

[T]he refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is substantially threatened or impaired.

Adjudication of a child in need of care is warranted when a parent shows a repeated pattern of placing a child at risk and exposing a child to a lack of adequate shelter. *State ex rel. AR*, 99-813 (La.App. 1 Cir. 9/24/99), 754 So.2d 1073. At the adjudication hearing, the state bears the burden of proving by a preponderance of the evidence that the child is a child in need of care. La.Ch.Code art. 665; *State ex rel. L.B.*, 08-1539 (La. 7/17/08), 986 So.2d 62. It is not the state's duty "to prove

3

its case beyond a reasonable doubt, by clear and convincing evidence, or to disprove every hypothesis of innocence." *State ex rel. L.B.*, 986 So.2d at 64.

In the instant matter, the petition alleged the children were victims of neglect as defined in La.Ch.Code art. 603(16), "due to the parents' inability to provide shelter for the family and failure to supervise the children[.]" The adjudication hearing took place on March 8, 2016 and April 6, 2016 where counsel on behalf of the State and the children presented the following witnesses: Tian Cino, Tatinisha Washington, Bobby Bernard, Jr., B.C, and N.D.

## *Initiation of Investigation*

Cino testified that she and B.C. were family friends. According to Cino's testimony, B.C., N.D., and their four children[2] moved into Cino's house because their trailer had burned down. They remained there for a couple of months during which time Cino became concerned about the children's welfare and contacted DCFS.

Washington, a DCFS employee assigned to investigate the matter, testified that she received an initial report on October 26, 2015, regarding neglect and lack of adequate supervision. The report, according to Washington, stated that children, ages two, three, and four years old, were outside unsupervised. The report, according to Washington, further noted the baby was sleeping in a car seat all day and night and was given a frozen Air-Head for teething purposes. Washington visited Cino's residence on October 27, 2015, wherein she interviewed both parents and observed the children. Washington revealed both parents admitted to giving A.C. a frozen Air-Head "for teething purposes."

---

[2] At the time of the two hearings at issue, N.D. was pregnant with and had given birth to her fifth child.

*Children's Medical Issues*

Cino testified A.C. was small and did "not really" grow or gain weight. She indicated, however, that all of the children were small as babies and their "development was always slower than normal." Cino stated a majority of A.C.'s nutrition came from a baby bottle containing a mixture of baby formula and rice cereal. She said all of the children were fed on a regular basis. Cino revealed that she changed A.C.'s diapers and noticed her bottom was raw, chaffed, and red. According to her testimony, Cino treated A.C.'s diaper rash with cornstarch since N.D. and B.C. neglected to treat it.

N.D. agreed with Cino's testimony regarding the cornstarch, but disagreed with respect to the parents' alleged failure to treat the diaper rash. N.D. testified that she and B.C. had diaper rash medication, and they "were already treating it." N.D. stated she changed A.C.'s diaper "[e]very time she was wet or dirty." N.D. and B.C. revealed two of their children wore diapers, and B.C. noted they were cleaned with wet wipes at each diaper change.

Washington testified that A.C. was very small. Washington advised that B.C. said his kids grew at a slower rate and blamed A.C.'s small size on his own mother or grandmother, who were also small. Washington observed A.C. was unable to hold her head up or crawl, which she found inappropriate. Washington noted that prior to the children's removal, she brought them to St. Martin Hospital to undergo physical examinations. Washington stated that she spoke to Nurse Deborah Higginbotham, who was concerned about A.C.'s health. Washington learned that seven-month-old A.C. weighed approximately ten pounds, which someone suggested was not normal. Washington said A.C. was diagnosed with malnourishment, although the parents did not express concern over her diagnosis

or advise that they were seeking treatment for same. Washington revealed the children were removed from their parents' custody on October 27, 2015, and placed in foster care under the direction of Bernard.

Bernard was employed by the DCFS as a foster care worker and responsible for reunifying the children with their parents. Bernard testified that A.C. weighed approximately ten pounds in October 2015 and that she weighed approximately eight pounds when she was born in March 2015. He revealed A.C.'s initial physical examination indicated she was severely underweight. Bernard testified that A.C. was developmentally delayed as she was not able to sit up, hold her head up, or crawl. He advised that A.C. was unable to pull up when she turned one year old. Bernard stated that A.C. was participating in the Early Steps program wherein she was assigned to a teacher and a physical therapist because she was diagnosed with developmental delays. He noted that as of March 2016, A.C.'s weight had increased to approximately seventeen pounds, she was beginning to crawl, and she was sitting upright unassisted.

Bernard testified that the other three children have had multiple foster care placements and underwent initial physical examinations. Bernard stated K.C.'s physical exam was normal with the exception of strained vision and that she "is now wearing glasses." Bernard testified that M.C.'s physical exam was normal, she needed glasses, and was referred to mental health services for Post-Traumatic Stress Disorder (PTSD). Bernard revealed M.C. was "thriving" in her current placement and was very active. With respect to S.C.'s physical exam, Bernard noted she was referred to treatment for PTSD and Attention Deficit Hyperactive Disorder (ADHD) and that her placement with her foster family was going well.

The children's medical records from St. Martin Hospital, dated October 27, 2015, were admitted into evidence at the hearing. It was noted therein that A.C. weighed ten pounds and eight ounces, was small for her age, and was undernourished. The medical records revealed that N.D. stated A.C. was "not sitting up or crawling but is attempting to crawl[.]" The records indicated that S.C., M.C., and K.C.'s diagnoses were normal.

The mother, N.D., testified that A.C. weighed eight pounds, three ounces at birth and found it odd that she only gained two pounds while in her care. N.D. indicated she fed A.C. cereal and formula every four hours and "when she got old enough, she was on baby food." N.D. admitted A.C. did not receive her two-month-old vaccination shots because it was not a legal requirement. According to N.D.'s testimony, the only shots A.C. had received were "[t]he ones in the hospital." N.D. stated the other children were up to date on their vaccination shots. N.D. testified that she brought A.C. to the doctor for regular checkups. N.D. testified that when A.C. was around two to two and one-half months old, a doctor put her on cereal because she was not getting enough nutrients from her soy-based formula. N.D. attempted to address the problem by adding rice or oatmeal cereal to A.C.'s formula; however, she failed to gain weight. According to N.D.'s testimony, she did not return to the doctor with A.C. With respect to A.C.'s October 27, 2015 physical examination, N.D. testified that the doctor did not provide instructions regarding how to care for A.C.'s malnourishment; rather, the discharge report instructed her to follow up with a pediatrician because A.C. was underweight. N.D. said she did not follow up due to the removal of the kids.

B.C. testified that they brought A.C. to the doctor twice before she was removed. According to his testimony, one appointment occurred when A.C. was

around two and one-half months old because B.C. was concerned about her weight. B.C.'s testimony is identical to N.D.'s in that the doctor advised that A.C. was not getting enough nutrition from the soy formula. B.C. revealed that A.C. started gaining weight after they introduced cereal into her formula. B.C. explained A.C. was allergic to regular milk just like ninety percent of his family. B.C. testified that most of his sixteen children, along with other family members, developed slowly. B.C. testified that prior to A.C.'s removal, she was sitting up and holding her head up, although not completely on her own. B.C.'s testimony also mirrors N.D.'s testimony with respect to the vaccination shots.

*Outside Activity*

Cino explained that the children never went outside to play; rather, they stayed in the house a majority of the time. Cino discussed the issue with the parents although she was told, "when they learned to behave[,] they could go outside." B.C. agreed the children spent all day inside because they lived close to roads and the highway. He said accidents happened in the neighborhood, and people drove down the road "ridiculously fast[.]"

*Inadequate Supervision*

Cino advised the children usually woke up around 4:30 to 5:00 a.m. while N.D. and B.C. would still be sleeping. Cino stated her backyard was close to Interstate 10 such that the children could have proceeded to it unsupervised. Cino revealed "two different occasions where [the children] actually got out of [her] house and went to the car outside while everyone was asleep." She said the first incident occurred when someone down the road saw the children and called a family member. Cino advised the second incident occurred when she woke up one morning, saw her front door was ajar, and saw the children outside. Cino testified

8

that the parents thereafter took measures to prevent the children from going outside by barricading the door in the room. She said the children's door had a lock with a latch at the top, although they would climb up the car seat to unlock it and escape. Cino testified that the parents told her the children were climbing up the car seat. Cino stated that N.D. and B.C. "didn't really spend a whole lot of time in the rooms with us." Cino advised that a majority of the time, N.D. and B.C. were in the kitchen or the other room and N.D. would get up and check on the children when "they heard stuff going on[.]"

Washington testified that N.D. "wasn't aware of the children being outside [unsupervised]; however [B.C.] said that he was inside the home watching the children from outside of a window."

*Verbal and Physical Abuse*

Cino said the parents physically disciplined and verbally abused their children. Cino revealed the children were required to go to bed between 4:30 and 5:00 p.m., although they would not fall asleep until approximately 9:00 to 9:30 p.m. Cino indicated that during this time period, the parents would fuss at them until the children "would finally just give up and be tired" and would fall asleep. Cino admitted the children would start shaking when they were in trouble. Cino stated N.D. and B.C. would spank the children, except for A.C., on a daily basis. According to Cino's testimony, B.C. spanked the children with a thick stick wrapped in duct tape with the children's names written on it. Cino called DCFS following an incident when the three older girls poured A.C.'s bottle on N.D., who was sleeping. Cino advised that N.D. became angry, called them "f'ing brats[,]" and threatened to "break their fingers. . . . [and] beat their butts." Cino stated she recorded the incident and played the recording for the social workers who went to

the house.  Cino was not in possession of the recording at the hearing.  Washington testified that she spoke with Cino and listened to the recording of N.D. "verbally cursing at the children and yelling at the kids."  Cino testified that she witnessed a fight between N.D. and B.C., which she believed dealt with A.C.  Cino revealed B.C. "was to the point that he was ready to take the girls and leave, because he . . . said [N.D.] got real close to the baby and . . . screamed at her."

Cino testified that A.C. spent a majority of the time in her car seat.  She noted N.D. would remove her from the car seat "once or twice on a daily basis . . . for a little bit."  Cino stated that during their two-month stay, she twice observed N.D. holding A.C. for more than an hour.  A.C. and the other girls were bathed about once a week, according to Cino.  She stated that if the children did not bathe, the parents washed them down or wiped their faces and feet, but "[n]ot really so much their bodies."  Washington noted the older three children were dressed but really dirty.  Washington said they looked like they had not recently bathed and had a "bad odor."  N.D. stated that she bathed the children "about twice a week" although she "wiped them down when [she] didn't give them a bath."  B.C. testified the children were not bathed daily because "they were never really dirty" since "most of the time they just played in the house."  B.C. stated the children were bathed approximately two or three times weekly.  The hospital medical records note that S.C., K.C., and M.C. were unkempt, wore dirty clothes, and were not clean.

Washington revealed that B.C. said he used "a paint stick" to discipline the children, although she could not view it because he said it was broken.  Washington testified the children did not have any bruises or marks on their bodies.  She indicated that she observed all of the children, but they would not speak.

10

N.D. testified that she may have called her older girls "fucking brats." N.D. said she raised her voice at and spanked her children but never beat them. N.D. said A.C.'s crib was destroyed by the fire; therefore, she had been sleeping in a car seat. N.D. admitted they would put the children down for bed around 6:00 p.m.; however, it would take three hours for them to fall asleep. N.D. agreed that if the children would not lay down and watch television, she would fuss at them every day for approximately three hours. N.D. stated the fussing included cursing and screaming. N.D. testified that she and/or B.C. would spank them every day. N.D. revealed that B.C. was present when she would fuss or spank the children, and vice versa. N.D. indicated that B.C. had a stick that he spanked the children with; however, she could not recall whether the children's names were written on it.

B.C. said N.D. was his fiancée. He agreed that he and N.D. spanked the children, but that it was not every night; rather, it was when they would not listen. He said they put the children down to sleep at 6:00 every night, but they would play around. After fussing at them for about twenty or thirty times, he would whip them for not going to bed. He said that the children sometimes would go to sleep quickly. B.C. said the stick did not have the children's names on it; however, it was wrapped with tape to prevent splinters. B.C. never heard N.D. call the children "fucking brats," and he denied calling them pejorative names.

### N.D.'s Substance Abuse and/or Other Medical Issues

Washington advised that N.D. was supposed to be receiving treatment at Tyler Mental Health Clinic, but she was unable to do so "due to her current pregnancy." Washington stated that N.D. was due to give birth to her fifth child in April 2016. Washington revealed N.D. denied using illegal substances, even though a drug test she took on November 4, 2015 tested positive for cannabinoids

and THC 345. Washington testified that N.D. had two or three previous cases with the DCFS arising from "drug exposed newborns" where she did not cooperate with the agency for treatment and services.

Bernard testified that his concerns with N.D. were her substance abuse issues, pregnancy, and her interaction with her children. He stated N.D. was discharged from the Healthy Start Program for not making contact with the agency. Bernard advised that N.D. refused to take additional drug tests following her November 4, 2015 drug test.

*B.C.'s Substance Abuse and/or Other Medical Issues*

Washington testified that B.C. was receiving treatment for PTSD at Tyler Mental Health Clinic. She stated B.C. "denied any drug . . . usage[,]" although a drug test administered to him on November 4, 2015, tested positive for THC 370.

Bernard's concern with B.C. was his substance abuse issues. Bernard testified B.C. was prescribed medications, i.e., Celexa, Trazodone, and Seroquel, for his Bi-Polar disorder and PTSD. B.C. admitted to smoking marijuana in lieu of Seroquel or Trazodone because the prescriptions made him feel like a zombie or he could not afford them "due to the issue with Medicaid." Bernard agreed that B.C.'s drug test was positive for THC; however, he did not have the results of the drug test at the hearing to substantiate his claim.

*Lack of Housing*

Washington testified that N.D. and B.C. were considered homeless by DCFS immediately prior to the removal of the children. Cino testified that B.C. and N.D.'s trailer had burned down and that they initially moved in with a friend whose home was unsuitable. Cino revealed the family subsequently moved into her home.

Washington advised that during her initial investigation, Cino wanted the parents to leave her residence that day. Washington noted:

> Once [Cino] stated that the family had to leave the home, [B.C.] stated that he had friends by Miss Patricia LeBlanc that he could move to. I spoke with Miss Patricia before removing the children. She said she was going to allow them to stay there for two (2) weeks; however[,] she had an open investigation with the needs for children that were not able to go to their home. And that was the only family member or friend that [B.C.] gave to me at that time.

After the hearing, the trial court found the children were in need of care, partially because the parents were not concerned with A.C. "not gaining any type of appropriate weight as the child aged." It stated that the parents' failure to bring A.C. to "physician after physician after physician" to determine why she was not gaining weight constituted neglect. The trial court revealed that "having [A.C.] sit in a carseat [sic] for all these extended periods of time is abuse." It further explained: "[B]etween the baby weight and . . . sitting in the carseat [sic], the baby's physical development was substantially delayed. The baby couldn't hold its head up. The baby had limited use or limited strength in the baby's extremities."

With respect to the bath situation, the trial court stated:

> [T]o bathe children, especially little girls, once a week, you can . . . only clean a child so much with baby wipes. They need soap. They need to get the dead skin off their body. They need to get whatever else that's in their hair. They need to . . . take a bath. I find that to be very abusive.

The trial court also discussed the verbal abuse as follows:

> What I also find to be abusive is the mother cursing out little children, especially little girls . . . because those children grow up thinking that's the appropriate way to act because they learned from their parents. Using the F word and whatever else word. That . . . really bothers me and this was done to all the children. The bathing was done to all the children. I understand that the baby, in my opinion, suffered more than the other kids. And to keep children locked up in

13

the house without being active, playing outside, I find that to be neglect.

In her appellate brief, N.D. contends that A.C.'s failure to gain weight arose from malabsorption rather than parental neglect. As noted above, however, the trial court's finding of neglect was not based upon A.C.'s failure to gain weight; rather, it was based on the parents' failure to bring her to more than one physician until a definite diagnosis could be obtained to determine why the child could not gain weight. We find that the evidence supports the trial court's conclusion in this regard.

N.D. further argues that there was no testimony indicating the parents' method of cleaning the children caused them harm. Neglect, however, is "the refusal or unreasonable failure of a parent . . . to supply the child with necessary . . . care, . . . for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is substantially threatened or impaired." La.Ch.Code art. 603(1). The State provided testimony that N.D. bathed the children one or two times per week and were wiped down with baby wipes in between baths. These wipe-downs were limited to hands and feet, according to the testimony. Washington revealed when she observed the children, they were dirty, had a bad body odor, and did not appear to have been recently bathed. The medical records noted the older children were unkempt, dirty, and needed a bath. The foregoing evidence was sufficient to allow the trial court to conclude that the parents' failure to adequately care for the children by regularly bathing them impaired their physical, mental, or emotional health.

In *State in Interest of I.B.W.*, 13-517 (La.App. 3 Cir. 10/9/13), 124 So.3d 567, this court found that the evidence was sufficient to support the trial court's

14

finding that the infant was in need of care and that continued custody was necessary. The evidence included testimony from the child protection investigator that he received a report of dependency approximately one week after the infant's birth. The investigator indicated the mother had two other children in state custody and that she was not complying with her case plan which required her to attend substance abuse treatment. The mother had also tested positive for narcotics on six occasions while she was pregnant.

In *State in Interest of Dronet*, 417 So.2d 1356 (La.App. 3 Cir. 1982), this court affirmed the trial court's judgment rendering the child in need of care. The record revealed the mother would habitually hitchhike and take the child with her. Upon return from these hitchhiking trips, the child would be dirty, had a bad diaper rash, and was in poor health.

In *State ex rel. L.M.*, 46,078 (La.App. 2 Cir. 1/26/11), 57 So.3d 518, the second circuit found that the trial court's adjudication of the mother's four children in need of care was not manifestly erroneous. It noted her children frequently did not have clean clothes and that the mother failed to make sure they were bathed or dressed appropriately.

Our review of the evidence in the record indicates that the State offered sufficient evidence to support a finding that there were reasonable grounds to believe the minor children were in need of care and that continued custody was necessary for their safety and protection. Accordingly, we cannot say that the trial court was manifestly erroneous or clearly wrong in its determination that the children were in need of care. Thus, N.D.'s argument is without merit.

## DECREE

The trial court's judgment ordering S.C., M.C., K.C., and A.C, to remain in foster care is affirmed.  All costs of this appeal are assessed to the mother, N.D.

**AFFIRMED.**